15 MAG 665

Approved: _____
ANDREW C. ADAMS / MICAH W.J. SMITH
Assistant U.S. Attorneys

Before:    HON. ANDREW J. PECK
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :   **COMPLAINT**
                                        Violation of 18 U.S.C.
            - v. -                  :   § 1958.

MIGUEL SUAREZ-MARTINEZ,              :   DOC # 1
  a/k/a "Aquilito,"
  a/k/a "Face,"                      :   COUNTY OF OFFENSE:
  a/k/a "Jayson S. Raffucci              NEW YORK
       Arcelay,"                     :

            Defendant.              :

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    DANIEL J. CALLAGHAN, being duly sworn, deposes and says that he is Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and charges as follows:

### COUNT ONE
### (Murder for Hire Conspiracy)

    1.   From at least in or about December 2014, up to and including on or about March 3, 2015, in the Southern District of New York and elsewhere, MIGUEL SUAREZ-MARTINEZ, a/k/a "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," the defendant, and others known and unknown, unlawfully and knowingly did combine, conspire, confederate, and agree together and with each other to travel in and cause another to travel in interstate commerce, and to use and cause another to use the mail and a facility of interstate commerce, with intent that a murder be committed in violation of the laws of a State and the United States as consideration for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value, to wit, SUAREZ-MARTINEZ, and others, known and

unknown, arranged to murder an individual believed by SUAREZ-MARTINEZ to be a material witness for the prosecution in the case of *United States* v. *Manuel Geovanny Rodriguez-Perez*, 10 Cr. 905 (LTS), in exchange for money, which arrangements depended in part upon travel from New Jersey to New York, as well as communications through a facility of interstate and foreign commerce.

(Title 18, United States Code, Section 1958.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

2. I have been a HSI Special Agent for approximately five years. During that time, I have participated in numerous investigations of violent narcotics conspiracies, including murder-for-hire and obstruction of justice schemes in furtherance of narcotics trafficking. During the course of these investigations, I have conducted or participated in surveillance, undercover transactions, the introduction of undercover agents, wire intercepts, the execution of search warrants, debriefings of informants, and reviews of taped conversations. Through my training, education and experience, I am familiar with the methods and practices employed by members of narcotics conspiracies, including the use prepaid "burner" telephones in order to evade detection by law enforcement and coded references to narcotics and/or the means and methods of trafficking in narcotics, including the use of violence to prevent prosecution or detection of narcotics traffickers and their co-conspirators.

3. I make this Affidavit in part on personal knowledge based on my participation in the investigation and conversations with other HSI Special Agents, and other law enforcement officers; conversations with, and review of recordings obtained by such agents and by cooperating witnesses; reviews of reports and other documents prepared by agents and others; and physical surveillance.

4. Throughout this Affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made unless I specifically so state. Rather, information about the statement was provided by the specified law-enforcement officer or other individual (who may have had either direct or indirect knowledge of the statement) to whom I have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and they are

set forth in substance and in part, unless otherwise indicated. Similarly, the information in this Affidavit resulting from surveillance, except where otherwise specifically indicated, does not set forth my personal observations, but rather was provided to me by other law-enforcement officers who observed the events described, and/or to whom I have spoken or whose reports I have read.

5. Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this Application. I have not attempted to set forth the complete factual history of this investigation or all of its details. In making this application, I rely only on the facts stated herein.

1. **Manuel Rodriguez's Murder for Hire History**

6. Since at least in or about February 2009, HSI and other agencies have been investigating a marijuana trafficking organization which distributes multikilogram amounts of marijuana throughout greater New York City and New Jersey (the "Organization"). Seizures of marijuana, marijuana proceeds, and other evidence; court-authorized interceptions over telephones used by members of the Organization; surveillance of the defendants and others; and other investigative tools have revealed a transportation system for marijuana and marijuana proceeds along the eastern seaboard. Marijuana is grown in Florida and elsewhere and often driven to New York in tractor trailers with cover loads of legitimate merchandise, and some of the proceeds from that marijuana are returned to Florida using the same transportation system, or via couriers who take commercial flights with large amounts of cash hidden in their luggage.

7. Among the organizers of this narcotics conspiracy is Manuel Geovanny Rodriguez-Perez, a/k/a "Manny," a/k/a "Shorty," a/k/a "Andres Garcia," who will be referred to as "Manuel Rodriguez" throughout this Complaint. Manuel Rodriguez has been indicted in connection with RICO charges, including murder in aid of racketeering. Indictment S38 10 Cr. 905 charges Manuel Rodriguez with a total of ten murders and ten attempted murders, principally in aid of a massive marijuana trafficking operation. The charged murders span from 1997 through 2011, and include the murder of the brother of a cooperating witness who had been incarcerated with Manuel Rodriguez after their arrests in October 2010. To date, several of Manuel Rodriguez's co-defendants have been convicted at trial or after the entry of a

3

guilty plea. Among those co-defendants, Theodore Jones has pleaded guilty to charges related to his role as a broker for hitmen working on behalf of Manuel Rodriguez. *See* S35 10 Cr. 905 (LTS) (charging Jones with, among other things, conspiracy to commit murder, murder, and attempted murder).

8. In the course of this investigation, I have spoken with a cooperating witness ("CW-1") who has pleaded guilty in connection with the RICO enterprise involving Manuel Rodriguez and who is cooperating with the Government in the hopes of obtaining leniency at sentencing. Information provided by CW-1 has been corroborated by, among other things, information provided independently by other cooperating witnesses and wire intercepts of Manuel Rodriguez and other members of his organization. CW-1 stated, in substance and in part, that:

   a. A particular individual ("Victim-1") was one of the first large-scale marijuana traffickers on Post Avenue in Upper-Manhattan (where the Rodriguez Organization was based for many years) in the early- to mid-1990s.

   b. Manuel Rodriguez ordered Victim-1's murder because Victim-1 introduced Manuel Rodriguez's marijuana supplier to certain of Manuel Rodriguez's customers, thus cutting out Manuel Rodriguez as the middle man for narcotics transactions between those individuals and thereby reducing his revenue from drug sales.

9. In the course of this investigation, I have spoken with a cooperating witness ("CW-2") who has pleaded guilty in connection with the RICO enterprise involving Manuel Rodriguez and who is cooperating with the Government in the hopes of obtaining leniency at sentencing. Information provided by CW-2 has been corroborated by, among other things, information provided independently by other cooperating witnesses and wire intercepts of Manuel Rodriguez and other members of his organization. CW-2 stated, in substance and in part, that the person later identified as MIGUEL SUAREZ-MARTINEZ, a/k/a "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," the defendant, (whom CW-2 identified as "Aquilito") participated in the planning and execution of two murders ordered by Manuel Rodriguez in the Dominican Republic in or about 2001 and in or about 2003.

## 2. The Defendant Agrees and Attempts to Commit a Murder on Behalf of Manuel Rodriguez

10. I have reviewed translations of recorded Spanish-language conversations held between CW-1 and MIGUEL SUAREZ-MARTINEZ, a/k/a, "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," and I have discussed these conversations with an agent of HSI who is fluent in Spanish. From those translations and discussions, I have learned, among other things, that, on or about December 28, 2014, an individual identifying himself as "Face," (and later identified as MIGUEL SUAREZ-MARTINEZ, a/k/a, "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," the defendant) placed a call to a telephone in the possession of CW-1. During that call, SUAREZ-MARTINEZ informed CW-1 that he was contacting CW-1 at the direction of a co-conspirator ("CC-1") for the purpose of soliciting work from Manuel Rodriguez; that SUAREZ-MARTINEZ was then living in the vicinity of Paterson, New Jersey; and that SUAREZ-MARTINEZ was willing to perform work for Manuel Rodriguez upon request.[1] Based upon my training and experience, on my experience in this investigation, and on the information provided by CW-2, as detailed above, I believe that SUAREZ-MARTINEZ was soliciting the opportunity to commit murders in exchange for payment and on behalf of Manuel Rodriguez.

11. In the course of this investigation, I have reviewed translations of recordings made, upon consent, by CW-1 of conversations between CW-1 and MIGUEL SUAREZ-MARTINEZ, a/k/a, "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," the defendant. Moreover, I participated in the surveillance of recorded meetings between CW-1 and SUAREZ-MARTINEZ.[2] From those

---

[1] From my review of translations of conversations between CW-1 and the person identifying himself as CC-1, I know that, on or about December 14, 2014, CC-1 contacted CW-1 and informed CW-1, in substance, that CC-1 would instruct an individual living in the United States to contact CW-1 for the purpose of soliciting work on behalf of Manuel Rodriguez. Based upon my training and experience, on my experience in this investigation, and on the information provided by CW-2, I believe that CC-1 was providing notice to CW-1 that another individual – later determined to be MIGUEL SUAREZ-MARTINEZ, a/k/a, "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," the defendant – would contact CW-1 for the purpose of soliciting the opportunity to commit murders in exchange for payment and on behalf of Manuel Rodriguez. Following this conversation between CW-1 and CC-1, SUAREZ-MARTINEZ contacted CW-1 for the purpose of arranging a murder for hire, as described herein.

[2] Attached as Exhibit 1 to this Complaint is a photograph of MIGUEL SUAREZ-MARTINEZ, a/k/a "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," captured at the time of the surveiled meeting with CW-1 on or about February 6, 2015. CW-2 has reviewed this photograph and identified the person

recordings and from my surveillance, I have learned, among other things, that:

      a. On or about February 6, 2015, CW-1 and SUAREZ-MARTINEZ met at a restaurant located in Manhattan, New York. During that meeting, CW-1 and SUAREZ-MARTINEZ discussed arrangements for SUAREZ-MARTINEZ to murder an individual described by CW-1 as a potential witness in the trial of Manuel Rodriguez. In substance and in part, SUAREZ-MARTINEZ stated, among other things, that:

      i. SUAREZ-MARTINEZ was willing to commit that murder in exchange for at least approximately $10,000, a portion of which would be used by SUAREZ-MARTINEZ to pay another individual to steal a car for transportation to commit the murder.

      ii. SUAREZ-MARTINEZ had previously committed four murders in the Dominican Republic and had served a prison sentence in connection with at least one of those murders.

      iii. SUAREZ-MARTINEZ prefers to use revolvers when committing murders, and specifically prefers to use .357 Magnums or .38 caliber firearms.

      iv. SUAREZ-MARTINEZ would await a call from CW-1 to make arrangements to meet again for CW-1 to provide further details about the whereabouts of the intended victim and the timing of the murder.

      b. On or about February 20, 2015, CW-1 and SUAREZ-MARTINEZ met at a restaurant located in Manhattan, New York. During that meeting, SUAREZ-MARTINEZ stated, in substance in in part, that SUAREZ-MARTINEZ would accept $1,000 in United States currency as an advance payment for the murder to be committed on behalf of Manuel Rodriguez, and would further require a total payment of $35,000, and that SUAREZ-MARTINEZ would commit the murder using a firearm to be provided by CW-1.

      c. On or about February 27, 2015, CW-1 and SUAREZ-MARTINEZ met at a location in Manhattan, New York. During that meeting, CW-1 offered, and SUAREZ-MARTINEZ accepted, $1,000 as an advance payment in consideration of the murder that SUAREZ-

---

depicted as "Aquilito," whom CW-2 knows to have participated in the murders-for-hire orchestrated by and on behalf of Manuel Rodriguez in or about 2001 and 2003, as described above.

MARTINEZ had previously agreed to commit on behalf of Manuel Rodriguez.

d. On or about March 2, 2015, CW-1 initiated a telephone call to SUAREZ-MARTINEZ during which CW-1 instructed SUAREZ-MARTINEZ to be present in the vicinity of the western end of Dyckman Street in Manhattan, New York, on March 3, 2015, at which time CW-1 would identify an intended victim for SUAREZ-MARTINEZ, after which SUAREZ-MARTINEZ would kill that person.

12. In the course of this investigation, I have reviewed translations of recordings made, upon consent, by CW-1 of conversations between CW-1 and CC-1, and I have discussed these conversations with an agent of HSI who is fluent in Spanish. From those translations and discussions, I have learned, among other things, that, on or about March 1, 2015, CC-1 informed CW-1 that CC-1 would provide CW-1 with contact information for another individual to whom CW-1 could forward payment intended for CC-1 in connection with the planned murder to be performed by MIGUEL SUAREZ-MARTINEZ, a/k/a, "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," the defendant.

13. On or about March 3, 2015, I participated in the arrest of MIGUEL SUAREZ-MARTINEZ, a/k/a, "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," the defendant, in vicinity of the western end of Dyckman Street in Manhattan, New York, following the consensually recorded telephone call from CW-1 to SUAREZ-MARTINEZ instructing SUAREZ-MARTINEZ to be in that area for purposes of committing a murder on behalf of Manuel Rodriguez. At that time, I observed, among other things, that, at the time of his arrest, SUAREZ-MARTINEZ was in possession of, among other things:

a. Two inoperable firearms that I had previously provided to CW-1 and which CW-1 then provided to SUAREZ-MARTINEZ in order to commit the murder for hire.

b. An identification card purportedly issued by the State of Pennsylvania on or about February 19, 2015, bearing the name "Jayson S. Raffucci Arcelay."

c. Seven $100 bills in United States currency, each of which had been previously provided to SUAREZ-MARTINEZ by CW-1 on or about February 27, 2015, as described above.

14. On or about March 3, 2015, I spoke with a Special Agent of the Department of Homeland Security (the "DHS Agent")

7

who is familiar with the research of individual subjects' immigration status. Based on my conversation with the DHS Agent, I have learned, among other things, that fingerprints of MIGUEL SUAREZ-MARTINEZ, a/k/a, "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," the defendant, obtained by law enforcement at the time of SUAREZ-MARTINEZ's arrest on or about March 3, 2015, match the fingerprints of a "Miguel Suarez-Martinez" who was, in or about August 2014, released by DHS on bond after an initial determination that SUAREZ-MARTINEZ entered the United States illegally.

WHEREFORE, I respectfully request that MIGUEL SUAREZ-MARTINEZ, a/k/a, "Aquilito," a/k/a "Face," a/k/a "Jayson S. Raffucci Arcelay," the defendant, be arrested, and imprisoned or bailed, as the case may be.

                                        DANIEL J. CALLAGHAN
                                        Special Agent
                                        Homeland Security Investigations

Sworn to before me this
3rd day of March, 2015

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

Ex. 1

